**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| BENJAMIN WILSON and JENNIE CORONA-CANTU, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>EDIBLE BRANDS, LLC,<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Benjamin Wilson and Jennie Corona-Cantu ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, bring this Class Action Complaint against Defendant Edible Brands, LLC ("Defendant" or "Edible Brands"). Plaintiffs allege the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiffs, which are alleged upon personal knowledge.

## NATURE OF THE ACTION

1. In recent years, federal courts across the country have warned that opaque digital-tracking practices pose a profound threat to Americans' privacy. The unauthorized collection of a person's browsing activity, website interactions, and device identifiers constitutes an invasion of the most basic expectation of privacy in one's online life. When a company affirmatively represents that users may

control whether their data is sold, shared, or tracked, but then secretly sells, shares, and tracks that data anyway, the misconduct is especially egregious.

2. Edible Brands operates a commercial website, https://www.ediblearrangements.com/ (the "Website"), through which it markets and sells fresh fruit arrangements, chocolate-dipped fruit, baked goods, gift baskets, flowers, and other similar products directly to consumers. Like many modern websites, the Website displays a cookie banner and a cookie settings interface purporting to give users meaningful control over what data the Website shares with third parties. Though Edible Brands' cookie banner appears differently in different states, such as California, Colorado, and New York, in all instances, Edible Brands assures users that they may control the sale or sharing of their personal information or can reject unnecessary cookies.

3. For instance, users visiting the Website in New York encounter "Cookie Banner One" and the "New York Cookie Settings," while users in California and Colorado encounter "Cookie Banner Two" and the "California and Colorado Cookie Settings." *See* **Exhibit A**, *Figures 1-4*.[1]

4. In all cases, Defendant's assurances are false. The Website begins placing and transmitting cookies and other third-party tracking technologies (the

[1] *See* Exhibit A at 1-4, *Figures 1-4*.

"Tracking Tools") capable of transmitting users' data the moment a user visits the Website, before the user has a chance to affirmatively accept any Tracking Tools.

5. Worse still, even after users affirmatively rejected all unnecessary cookies, the Website continues to utilize and deploy Tracking Tools which transmit users' data to the advertising, social media, and analytics companies that designed and operate the Tracking Tools (the "Tracking Entities").

6. The Cookie Settings also claim that the "Targeting Cookies" they place "do not store directly personal information," while placing personally identifiable cookies from Meta.

7. Edible Brands' Cookie Settings deceive users by (1) placing Tracking Tools on users' browsers, which allow Tracking Entities to intercept users' communications with the Website before users have the ability to interact with the cookie banner, (2) continuing to use Tracking Tools that intercept and transmit user data to Tracking Entities after users reject all unnecessary cookies and (3) fraudulently misrepresenting that the "Targeting Cookies" do not share personally identifying information. Edible Brands' Website design and procurement of Tracking Entities and Tracking Tools to monitor, intercept, and transmit user data constitute an invasion of privacy, intrusion upon seclusion, and fraud. Misrepresenting the effectiveness of a cookie opt-out mechanism effectively deprives users of control over their personal information.

8. The Tracking Tools collect detailed interaction and behavioral data, including users' selections of links, buttons, forms, and other on-page elements, as well as information entered into search fields. This data may include webpages and products viewed or purchased; inferred interests, preferences, age, location, or other characteristics based on user behavior and content engagement; and personal, device, and technical identifiers such as device type, operating system, and browser type. The data also includes persistent identifiers that enable recognition of users across sessions and websites, users' email addresses, and approximate geolocation information derived from IP addresses or similar signals. Collectively, this information is referred to as "Sensitive Information." This Sensitive Information is collected regardless of whether users click the "Accept Cookies" or "Accept All Cookies" button.

9. In short, the Website's Cookie Settings materially mislead users about the use and sale of their data. Defendant lulls users into a false sense of security, privacy, and control while simultaneously enabling third parties to monitor, intercept, and transmit users' online behavior in real time. Such conduct deprives users of control over their personal information and violates fundamental privacy protections.

10. Plaintiffs' experience reflects the conduct described above. Plaintiffs, residents of California and Colorado, visited Defendant's Website in or around

2024 and 2025 for ordinary consumer purposes, including browsing and comparing products, reviewing pricing information, and otherwise navigating the Website's content. While accessing the Website from their respective home states, Plaintiffs encountered the cookie banner and related cookie settings. Plaintiffs affirmatively declined all non-essential cookies in reliance on Defendant's representations that marketing and tracking technologies would be disabled upon rejection and reasonably believed that non-essential tracking would not be activated absent express consent. Despite these actions and expectations, Defendant deployed Tracking Tools that automatically intercepted, recorded, and transmitted Plaintiffs' Sensitive Information to the Tracking Entities. In each instance, Plaintiffs reasonably relied on Defendant's representations regarding cookie controls and privacy protections, yet their personal information was nonetheless collected and shared without their valid consent.

11. Defendant invaded Plaintiffs' fundamental right to privacy and fraudulently misrepresented the Website's data-collection practices by facilitating the Tracking Entities' unlawful interception of and intrusion into Plaintiffs' Sensitive Information and private communications. In doing so, Defendant violated the federal Wiretap Act, 18 U.S.C. § 2510, et seq.; California's Invasion of Privacy Act ("CIPA"), including Penal Code § 631 (illegal wiretapping) and § 638.51 (unlawful use of a pen register or trap and trace device); and common law,

including invasion of privacy, intrusion upon seclusion, fraud and deceit, and unjust enrichment. Plaintiffs bring this action on behalf of themselves and a class of similarly situated users harmed by Defendant's deceptive and unlawful surveillance practices.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Federal Wiretap Act, 18 U.S.C. § 2510, et seq. This Court has supplemental jurisdiction over the non-federal claims in this action. This Court also has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is more than 100, and at least one member of the Class defined below is a citizen of a different state that is diverse from Defendant's citizenship. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A). Defendant has its principal place of business located in this District.

13. This Court has personal jurisdiction over Defendant because Defendant is registered to do business and maintains its principal place of business in this District.

14. Venue is proper in this Court because Defendant's principal place of business is located in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

15. Plaintiff Benjamin Wilson is, and at all relevant times has been, a citizen and resident of the State of Colorado. Plaintiff Wilson accessed and used Defendant's Website while physically located in Colorado. Plaintiff Wilson visited the Website in or around September 2024. During his visit, Plaintiff Wilson browsed the Website by using the search option and searched for chocolate-covered strawberry arrangements offered by Defendant. Plaintiff Wilson does not have an account with Defendant and did not make any purchases from Defendant. In connection with his visit to Defendant's Website in or around September 2024, Plaintiff Wilson was presented with and interacted with Defendant's Cookie Banner Two, selected "Do Not Sell My Personal Information," and utilized the California and Colorado Cookie Settings to affirmatively toggle off all non-essential cookies. Plaintiff Wilson reasonably believed that, after toggling off and rejecting non-essential cookies, and absent any affirmative consent to tracking technologies, his browsing activity would not be tracked beyond what was strictly necessary for the Website's functionality. Despite Plaintiff Wilson's affirmative rejection of tracking, Defendant deployed third-party Tracking Tools that

intercepted, recorded, and transmitted Plaintiff Wilson's browsing activity, device identifiers, and related metadata to the Tracking Entities. The interception disclosed the substance of Plaintiff Wilson's communications with the Website, including the webpages he viewed relating to Defendant's chocolate-covered strawberry arrangements, together with identifiers and related metadata. These Tracking Tools operated despite Plaintiff Wilson rejecting non-essential cookies and never providing affirmative consent to non-essential tracking technologies. As a result, Plaintiff Wilson's Sensitive Information was intercepted and disclosed without his consent. Had Plaintiff Wilson known that Defendant would deploy Tracking Tools and disclose his information to third parties despite his rejection of non-essential cookies, he would not have continued to use the Website.

16. Plaintiff Jennie Corona-Cantu is, and at all relevant times has been, a citizen and resident of the State of California. Plaintiff Corona-Cantu accessed and used Defendant's Website while physically located in California. Plaintiff Corona-Cantu visited the Website in or around November 2025. During her visit, Plaintiff Corona-Cantu browsed the Website to view birthday arrangements and gift offerings provided by Defendant, specifically the "Occasions" and "Birthday" sections and searched for "Birthday Delivery & Gift Ideas" on Defendant's Website. Plaintiff Corona-Cantu had an account with Defendant but did not make any purchases. In connection with her visit to Defendant's Website in or around

November 2025, Plaintiff Corona-Cantu encountered and interacted with Defendant's Cookie Banner Two, selected "Do Not Sell My Personal Information," and utilized the California and Colorado Cookie Settings to affirmatively toggle off all non-essential cookies. Plaintiff Corona-Cantu reasonably believed that, after toggling off and rejecting non-essential cookies, and absent any affirmative consent to tracking technologies, her browsing activity would not be tracked beyond what was strictly necessary for the Website's basic functionality. Despite Plaintiff Corona-Cantu's lack of consent to tracking, Defendant deployed third-party Tracking Tools that intercepted, recorded, and transmitted Plaintiff Corona-Cantu's browsing activity, device identifiers, and related metadata to the Tracking Entities. The interception disclosed the substance of Plaintiff Corona-Cantu's communications with the Website, including the webpages she viewed, together with identifiers and related metadata. These Tracking Tools operated despite Plaintiff Corona-Cantu rejecting non-essential cookies and never providing affirmative consent to non-essential tracking technologies. As a result, Plaintiff Corona-Cantu's Sensitive Information was intercepted and disclosed without her consent. Had Plaintiff Corona-Cantu known that Defendant would deploy Tracking Tools and disclose her information to third parties despite her rejection of non-essential cookies, she would not have continued to use the Website.

17. Defendant Edible Brands, LLC ("Defendant" or "Edible Brands") is a for-profit limited liability company organized and existing under the laws of Georgia, with its principal place of business in Atlanta, Georgia. Edible Brands owns and operates the Edible Arrangements brand and designs, markets, and sells fresh fruit arrangements, chocolate-dipped fruit, baked goods, gift baskets, flowers, and other gifting products to consumers throughout the United States, including through its nationally accessible commercial website, https://www.ediblearrangements.com/. Through the Website, Defendant markets, advertises, and sells its products directly to consumers, including consumers in California.

## FACTUAL ALLEGATIONS

### I. How Websites Function

18. Websites are hosted on servers, in the sense that their files are stored on and accessed from servers. Websites are, in part, "run" on a user's internet browser, as the browser loads and processes the website's code to display the webpage.

19. Websites are a collection of webpages. A webpage is essentially a document containing text written in HyperText Markup Language (HTML) code.[2]

[2] *What is the difference between webpage, website, web server, and search engine?*, MOZILLA, https://developer.mozilla.org/en-

20. Each webpage has a unique address, and two webpages cannot be stored at the same address.[3]

21. When a user navigates to a webpage (by entering a URL address directly or clicking a hyperlink containing the address), that user's browser contacts the DNS (Domain Name System) server, which translates the web address of that website into a unique IP (Internet Protocol) address.[4]

22. An IP address is "a unique address that identifies a device on the Internet or a local network."[5] Essentially, an IP address is:

> The identifier that allows information to be sent between devices on a network: they contain location information and make devices accessible for communication. The internet needs a way to differentiate between different computers, routers, and websites. IP addresses provide a way of doing so and form an essential part of how the internet works. *Id.*

23. When a user's browser navigates to a webpage, it sends an HTTP request to the server identified by the webpage's IP address (the "Request URL"). This request is for the specific resource located at the URL. If the server fulfills this

US/docs/Learn/Common_questions/Web_mechanics/Pages_sites_servers_and_search_engines (last visited Feb. 17, 2026).

[3] *Id.*

[4] *How the web works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited Feb. 17, 2026).

[5] *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited Feb. 17, 2026).

request, it issues an HTTP response that includes the request status and, typically, the requested content. This content is then transmitted in small chunks, known as data packets, and reassembled into the complete webpage by the user's browser upon arrival.[6]

24. This Request URL includes a domain name and path, which identify the specific content being accessed on a website and its location within the website's structure.

25. The Request URL typically contains parameters. Parameters are values added to a URL to transmit data to the recipient, prefaced by a question mark to signal the use of parameters. Parameters direct a web server to provide additional context-sensitive services,[7] as depicted below:




*Figure 1 – Mozilla's diagram of a URL, including parameters*[8]

26. Website owners or web developers write and manage the URLs for their websites.

---

[6] *Id.*

[7] To see examples of how Defendant used parameters to provide additional information here, *see infra,* Section C(2).

[8] *What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Feb. 17, 2026).

27. URL encoding is an essential process to ensure that data is safely transmitted via URLs. URL encoding converts characters into a format that can be transmitted over the Internet.[9] For example, URLs cannot contain spaces; URL encoding normally replaces a space with a plus (+) sign or with %20.

28. The American Standard Code for Information Interchange (ASCII) was designed in the early 1960s as a standard character set for computers and electronic devices.[10] Today, UTF-8 is the Internet's most common character encoding.[11] URL decoding is the process of URL encoding in reverse so that the URL is in a more readable format.[12] To demonstrate:




*Figure 2 – Demonstrating URL encoding and decoding*[13]

[9] *Id.*
[10] *HTML ASCII Reference*, W3 SCHOOLS, https://www.w3schools.com/charsets/ref_html_ascii.asp (last visited Feb. 17, 2026).
[11] *UTF-8*, MOZILLA, https://developer.mozilla.org/en-US/docs/Glossary/UTF-8 (last visited Feb. 17, 2026).
[12] *What Is URL Decoding and URL Encoding?*, GOCHYU (last modified Oct. 18, 2020) https://gochyu.com/blog/url-encode-decode (last visited Feb. 17, 2026).
[13] Viraj Shetty, *URL Encoding in a few minutes*, YOUTUBE (Sept. 5, 2023) https://www.youtube.com/watch?v=ru0iCHsmsLc (last visited Feb. 17, 2026).

29. Similarly, parameters and metadata can be parsed and separated into easily reviewed, searchable formats.




*Figure 3 – Sample webpage used to demonstrate a webpage URL*

30. After sending the Request URL, and after the server responds to the Request URL, the user's browser assembles the packets sent by the server back into the HTML code of the webpage, which is then processed by the user's browser, as it arrives,[14] and rendered into a visual display according to the instructions of the HTML code.[15] This is the visible, and usually interactable, website that most people think of.

31. To provide more complex website functionality, website developers will include more complex commands written in other computer programming languages, such as JavaScript snippets, within the HTML documents.[16]

32. Such complex tasks include code used to monitor and report user activity.

33. In short, the Internet relies on a constant back-and-forth stream of requests and responses between a user's browser and a website's stored coding and

---

[14] This processing of webpage data as it arrives is called "parsing," and allows web browsers to convert raw data received over the internet into structured data objects used by the renderer built-in to the browser to create images on the screen. This means that, unless a software command, like a Tracking Tool, is physically last to arrive at a device, it is loaded and executed before the communication has finished being received. *See Populating the page: how browsers work*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Feb. 20, 2026).

[15] *What Is a URL?*, MOZILLA, (last visited Feb. 17, 2026).

[16] *See JavaScript: Adding interactivity*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited Feb. 17, 2026).

data. Importantly, the requests and responses provide a perfect snapshot of everything a user does (or does not do) on a website, and when and how they do it, and with what software and hardware.

34. Unbeknownst to users, as they browse the Website, the Tracking Tools, including third- and first-party cookies, capture and record both incoming and outgoing requests and responses that make up their entire experience on the Website.

## II. Defendant Programmed the Website to Utilize Cookies and Tracking Tools

35. Defendant voluntarily integrated Tracking Tools from various Tracking Entities into its Website's programming. Defendant's use of such tools on its Website is performed pursuant to commercial agreements between Defendant and third parties, including Tracking Entities.

36. The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website's server to a user's web browser and stored locally on the user's device. Cookies typically contain unique identifiers that enable a website to recognize and differentiate individual users. These cookie files are automatically transmitted back to web servers via HTTP requests, allowing the Website and third parties to identify the device making the request and to record a session reflecting how the user

interacts with the Website, i.e., everything they view, click, type, or even hover over.

37. First-party cookies are those placed directly on the user's device by the web server with which the user is knowingly communicating, in this case, Defendant's Website. First-party cookies are commonly used to recognize users across repeated visits to the same website and to track their on-site activity.

38. Third-party cookies are placed by domains other than the Website's domain, such as google.com, facebook.com, and other advertising or analytics domains. When a user's browser loads a webpage containing embedded cookies and Tracking Tools, the third party's scripts determine whether its cookies already exist on the user's device and, if not, cause those cookies to be stored. These third-party cookies contain unique identifiers that allow third parties to recognize and track individual users across different websites, including the Website, and across multiple browsing sessions.

39. Defendant placed the Tracking Tools, including cookies, on the Website. The Tracking Tools intercept users' communications when they communicate with the Website and transmit those communications to the third-party Tracking Entities. The Tracking Tools transmit cookies and other identifiers that identify users on the Website and associate them with their communications.

40. Defendant explains its use of Tracking Tools on the Website's Cookie Settings by stating, in substance, that they store cookies on users' browsers to "make the site work" and to "give you a more personalized web experience."

41. The Cookie Settings further represent that "Strictly Necessary Cookies" are required for the Website to function properly.

> These cookies are necessary for the website to function and cannot be switched off in our systems. They are usually only set in response to actions made by you which amount to a request for services, such as setting your privacy preferences, logging in or filling in forms. You can set your browser to block or alert you about these cookies, but some parts of the site will not then work. These cookies do not store any personally identifiable information.

42. The Cookie Settings further represent that "Targeting Cookies" are used to provide enhanced functionality and personalization to users.

> These cookies may be set through our site by our advertising partners. They may be used by those companies to build a profile of your interests and show you relevant adverts on other sites. They do not store directly personal information, but are based on uniquely identifying your browser and internet device. If you do not allow these cookies, you will experience less targeted advertising.

43. The Cookie Settings further represent that "Performance Cookies" are used to improve website performance and functionality.

> These cookies allow us to count visits and traffic sources so we can measure and improve the performance of our site. They help us to know which pages are the most and least popular and see how visitors move around the site.
>
> All information these cookies collect is aggregated and therefore anonymous. If you do not allow these cookies, we will not know when

> you have visited our site, and will not be able to monitor its performance.

44. The Cookie Settings further represent that "Social Media Cookies" are used to enable users to share content and build profiles on social media.

> These cookies are set by a range of social media services that we have added to the site to enable you to share our content with your friends and networks. They are capable of tracking your browser across other sites and building up a profile of your interests. This may impact the content and messages you see on other websites you visit. If you do not allow these cookies, you may not be able to use or see these sharing tools.

45. Defendant provides additional disclosures regarding its use of Tracking Tools in its Privacy Policy. In the section addressing "What Types of Information Do We Collect," Defendant informs users that certain third parties providing advertising services may collect or receive information about users' interactions with the Website through cookies and similar technologies, and that such information may be combined with data collected across different websites to deliver more relevant advertising.

> We collect certain analytics information automatically as you navigate our Services. This includes cookies, tracking pixels, tags or similar tools, which may collect information about your browser, device, geolocation, and interactions with the Services, Site, or emails. For more information, please view the "**How Do We Use "Cookies" and Other Tracking Technologies?**" section below. We collect this information for the purposes of account creation and management,

advertising and marketing, analytics and research, customer service, and website security and maintenance.[17]

## III. Defendant's Website Uses Tracking Tools

46. Defendant operates the Website and has installed Tracking Tools on the Website created by Tracking Entities. These Tracking Tools operate invisibly, tracking Website users' activity surreptitiously by intercepting communications as they arrive at or are sent by users' devices, copying the contents of those communications, and generating new Request URLs that are transmitted to the Tracking Entities.

47. Generally, the Tracking Tools collect information about users' site activity when events specified by the Defendant, like adding a product to the shopping cart or loading specific webpages, are triggered. Defendant added parameters to events that determine just how much data is collected, and how specific that data is.

48. Parameters are strings of text that website owners add to a URL to track and organize their webpages.[18] URL parameters include key-value pairs formatted as "key=value."

---

[17] Edible Brands LLC, *Privacy Policy*, https://www.ediblearrangements.com/legal/privacy-policy (last visited August 10, 2026).

[18] Yongi Barnard, *URL Parameters: What They Are and How to Use Them Properly*, BACKLINKO (last updated Feb. 5, 2026) https://backlinko.com/url-parameters (last visited Feb. 17, 2026).

a. The "key" is what the website owner wants to adjust or track (e.g., "color" or "ev" for event)

b. The "value" is the specific setting or data for that parameter (e.g., "yellow" or "PageView" for a user taking the action of adding a product to their online shopping cart)




*Figure 4 – Diagram of a URL displaying how parameters function*[19]

**A. The TikTok Pixel**

49. TikTok offers software known as a "tracking pixel" to track users' actions, behavior, and conversions across the Website (the "TikTok Pixel").

50. The TikTok Pixel is a snippet of code that begins to collect information the moment a user lands on the Website, before any pop-up or cookie banner advises them of the invasion or seeks their consent. To use the TikTok Pixel,

[19] *Id.*

the website operators, including Defendant, must include the specific pixel IDs associated with their websites, which allows TikTok to link the intercepted data back to their individual TikTok business profiles.[20]

51. Defendant's TikTok Pixel ID is included in transmissions sent to and from users' devices, and is "CFEJBJBC77UEUGLE0I30".

52. TikTok Pixel users make use of events to collect even more specific data on users' activities, including for the actions taken on a webpage (e.g., clicking a specific button or element, adding an item to a cart, and when a webpage with a URL containing a specified keyword is loaded onto a user's browser), the value of the purchase, and the product purchased.[21]

53. These event-triggers cause data to be sent as communications are received by users (through webpage loading events), and as communications are sent to the Website (through button clicking and similar events).

54. The TikTok Pixel also collects:

a. The time website actions took place;

---

[20] *See generally Troubleshoot with Pixel Helper*, TIKTOK, https://ads.tiktok.com/help/article/tiktok-pixel-helper-2.0?lang=en (last visited Feb. 17, 2026) (noting that a missing or invalid Pixel ID will cause errors when using the TikTok Pixel).

[21] *How to Set Up Events and Parameters with Events Builder*, TIKTOK, https://ads.tiktok.com/help/article/how-to-set-up-events-and-parameters (last visited Feb. 17, 2026) (describing how to designate events).

b. The IP address (which is used to determine the geographic location of a user);

c. Device information, including make, model, operating system, and browser information;

d. Cookies that can be used to identify users; and

e. Metadata and button clicks.[22]

55. The information the TikTok Pixel collects provides Defendant and TikTok with a better understanding of who Defendant's customers are, which webpages users have visited, and how they interact with the Website.

56. Defendant enabled TikTok's "Advanced Matching" feature on the Website. Advanced Matching allows Defendant to "match customer information such as email and phone number along with actions people take on [the Website]."[23] Once Advanced Matching is active, the TikTok Pixel "will automatically find customer information and match it with people on TikTok."[24] TikTok then provides Defendant with custom audiences based on website user

[22] *About TikTok Pixel*, TIKTOK, https://ads.tiktok.com/help/article/tiktok-pixel (last visited Feb. 17, 2026).
[23] *About Advanced Matching for Web*, TIKTOK, https://ads.tiktok.com/help/article/advanced-matching-web?lang=en (last visited Feb. 17, 2026).
[24] *How to set up Automatic Advanced Matching*, TIKTOK, https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en (last visited Feb. 17, 2026).

events, like page views or purchases, to model lookalike audiences.[25] Lookalike audiences allow Defendant to retarget users who have already visited or made purchases on the Website and serve them relevant ads on TikTok based on their interactions with the Website.[26] [27]

57. Put simply, the TikTok Pixel collects as much data as it can about otherwise anonymous visitors to the Website and matches it with existing data TikTok has acquired and accumulated about hundreds of millions of Americans to identify users and develop their marketing profiles, improving Defendant's conversion rates and reducing overall advertising costs.[28]

58. Defendant used the TikTok Pixel to monitor and log, in real time from users' browsers, when users clicked on specific products, loaded webpages, added specific products to cart, and proceeded through the checkout process to payment and shipping.[29]

59. The TikTok Pixel also captures users' identifying cookies (the _ttp

---

[25] *Get started with the TikTok Pixel: a small business guide*, TIKTOK (Sept. 6, 2024) https://ads.tiktok.com/business/en-US/blog/get-started-with-tiktok-pixel (last visited Feb. 17, 2026) (benefits of using the TikTok Pixel).

[26] *See* Lizzie Davey, *How to use TikTok Pixel: TikTok conversions tracking*, LEADSBRIDGE (May 2, 2025) https://leadsbridge.com/blog/tiktok-pixel/ (last visited Feb. 17, 2026).

[27] *See* Exhibit A at 7, *Figure 9*.

[28] *Id.*

[29] *See* Exhibit A at 8-9, *Figures 10-12*.

cookie is used to identify TikTok users[30]), and hashed email, which can still be de-anonymized through the use of a tool called a "reverse lookup table."[31]

60. Plaintiffs had a reasonable expectation that the following information would not be exposed to the Tracking Tools placed by Defendant: (i) Plaintiffs' identifying information, (ii) information that designated Plaintiffs as interested in purchasing or otherwise as a purchaser of the Defendant's products, and (iii) IP address and identifier information relating to who Plaintiffs are, and who Plaintiffs were communicating with to obtain the products.

61. Using the TikTok Pixel benefits Defendant by allowing Defendant to effectively track conversions, optimize the delivery of its ad campaigns, create and target its own custom audiences, and create and access vast amounts of data to run successful ad campaigns.[32]

62. TikTok benefits, in turn, by using data collected by the TikTok Pixel to improve its own products and services, including the sale of targeted advertising,

---

[30] *See G-Star Raw: List of Cookies* https://assets.g-star.com/v1/static/Cookielist_Jun_2022#:~:text=Tiktok%20tta_attr_id.%2012%20months%20This%20cookie%20is,measure%20how%20different%20campaigns%20and%20marketing%20strategies (last visited Feb. 17, 2026).
[31] *Can someone please explain reverse look up tables?*, SOFTWARE ENGINEERING, https://softwareengineering.stackexchange.com/questions/277152/can-someone-please-explain-reverse-look-up-tables (last visited Feb. 17, 2026).
[32] *See Benefits of using the TikTok Pixel*, TIKTOK (Sept. 6, 2024) https://ads.tiktok.com/business/en-US/blog/get-started-with-tiktok-pixel?acq_banner_version=73412989 (last visited Feb. 17, 2026).

and to generate its own benchmarking reports to share with other TikTok business customers.[33]

63. In fact, TikTok admits that it gathers Website visitors' Sensitive Information via the TikTok Pixel and shares that Sensitive Information with third or fourth parties,[34] just as Plaintiffs' Sensitive Information was gathered and shared here.

64. According to a leading data security firm, the TikTok Pixel secretly installed on Defendant's Website is particularly invasive. The TikTok Pixel "immediately links to data harvesting platforms that pick off usernames and passwords, credit card and banking information, and details about users' personal health."[35] The TikTok Pixel also collects "names, passwords and authentication codes" and "transfer[s] the data to locations around the globe," and does so "before users have a chance to accept cookies or otherwise grant consent."[36]

---

[33] *TikTok Business Products (Data) Terms*, TIKTOK (July 29, 2024) http://ads.tiktok.com/i18n/official/policy/business-products-terms (last visited Dec. 22, 2025).

[34] *See Privacy Policy*, TIKTOK (Feb. 5, 2026) https://www.tiktok.com/legal/page/us/privacy-policy/en (last visited Feb. 26, 2026).

[35] *See* Aaron Katersky, *TikTok Has Your Data Even If You've Never Used The App: Report*, ABC NEWS (Mar. 16, 2023 1:59 PM) https://abcnews.go.com/Business/tiktok-data-app-report/story?id=97913249 (last visited Feb. 17, 2026).

[36] *Id.*

65. The TikTok Pixel instantly sends communications to TikTok when a user views the page and tracks page interactions.

66. To use the TikTok Pixel, Defendant agreed to TikTok's Business Products (Data) Terms (the "TikTok Terms"). But Plaintiffs and other Website visitors are never exposed to these terms (nor would they have any reason to look for them) as they form the agreement between Defendant and TikTok, which agreement is not even known to Plaintiffs and Website visitors.

67. The TikTok Terms inform website owners using TikTok Pixel that their use of the TikTok Pixel shares or enables TikTok to access their website users' contact details, developer data, and/or event data.[37]

68. The TikTok Terms are transparent that TikTok will process users' data to match contact details against corresponding accounts and subsequently match those accounts with the users' corresponding event data.[38]

69. TikTok puts TikTok Pixel users, such as Defendant, on notice that they "must only share with us or enable us to access Business Products Data in a manner that is transparent and lawful."[39] TikTok makes clear that the onus is on Defendant to provide all necessary transparency notices, and obtain all necessary

---

[37] *TikTok Business Products (Data) Terms*, TIKTOK (July 29, 2024) (last visited Dec. 22, 2025).
[38] *Id.*
[39] *Id.*

rights, permissions, and lawful bases, including consent, to share information with TikTok.

70. TikTok educates and reminds TikTok Pixel users of their obligation not to share any data "from or about Children or that includes health or financial information, or other categories of sensitive information."[40]

71. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the TikTok Pixel and ignored TikTok's warnings to safely handle its users' data and warn its users that the Website would disclose their information in a manner that threatened their private information.

**B. The Meta Pixel**

72. Facebook offers its own tracking pixel known as the Facebook or Meta Pixel (the "Meta Pixel") to website owners for the purpose of monitoring user interactions on their websites, which can then be shared with Facebook.

73. The Meta Pixel is a marketing tool that can only be added to a webpage by website developers. A website operator must sign up for a business account or

---

[40] *Id.*

link a related Facebook account with its Pixel and then add code to the website to make use of the Meta Pixel.[41]

74. Upon creating a Meta Pixel, a Pixel ID (also called a DataSet ID by Meta) is generated.[42] This Pixel ID is used to initialize the Meta Pixel, either by allowing Meta to fetch a predetermined library of code related to that ID, or otherwise by identifying the website owner's Facebook account used to receive the collected data when programming the Pixel directly into a website.[43]

75. This Pixel ID must match "a known Pixel ID" in Meta's system,[44] and is transmitted by the Meta Pixel.[45]

76. As Facebook notes, the Meta Pixel must be added to each individual page that a website owner wishes to be tracked.[46]

---

[41] *Setup and install the Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited Feb. 17, 2026).
[42] *Id.*
[43] *Get Started*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Feb. 17, 2026) ("To install the Pixel, add its base code…on every page where you will be tracking website visitor actions.").
[44] *Pixel Helper*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/support/pixel-helper (last visited Feb. 17, 2026).
[45] *Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited Feb. 17, 2026).
[46] *Get Started*, FACEBOOK, (last visited Feb. 17, 2026) ("To install the Pixel, add its base code…on every page where you will be tracking website visitor actions.").

77. Defendant places the Meta Pixel on the Website to gather, collect, and then transmit user information to Facebook.[47] Defendant and Facebook use this information to build valuable personal profiles for Website users to inform their targeted advertising campaigns, enhancing marketing effectiveness and increasing the chance of converting users into paying customers.[48]

78. The harvested data improves Defendant's advertising by pinpointing audience demographics by interests, gender, or location, and finding the people who are most likely to take action and view content.[49]

79. Once implemented on a website, the Facebook Pixel begins to share users' information the moment a user lands on the website.

80. When a Facebook user logs onto Facebook, tracking cookies, including the "c_user" cookie, the data cookie, and the "fr" cookie, are automatically created and stored on the user's device.[50] These cookies allow Facebook to link the data it receives through the Meta Pixel to individual Facebook users.

---

[47] The Facebook Pixel allows websites to track visitor activity by monitoring user actions ("events") that websites want tracked and share a tracked user's data with Facebook. *See Meta Pixel*, FACEBOOK (last visited Feb. 17, 2026).

[48] *See Meta Pixel*, FACEBOOK (last visited Feb. 17, 2026).

[49] *See Audience ad targeting*, FACEBOOK, https://www.facebook.com/business/ads/ad-targeting (last visited Feb. 17, 2026).

[50] *Cookies Policy: What are cookies, and what does this* policy cover?, FACEBOOK (Dec. 12, 2023) https://www.facebook.com/policy/cookies/ (last visited Feb. 17, 2026).

81. The c_user cookie, for example, contains a series of numbers (the user's Facebook ID, or "FID") to identify a user's profile.




*Figure 5 – Sample c_user cookie, containing FID of test account created by Plaintiffs' counsel to investigate the Facebook Pixel*

82. The FID can simply be appended to www.facebook.com/ to navigate to the user's profile (e.g., www.facebook.com/[FID]). Appending the FID from *Figure 5* to the Facebook URL in a standard internet browser (here, www.facebook.com/100091959850832) redirects the webpage straight to the Facebook profile associated with the FID, as depicted below:




*Figure 6 – Sample Facebook account created by Plaintiffs' counsel to investigate the Facebook Pixel, with FID highlighted in URL*

83. The Meta Pixel tracks user activity on web pages by monitoring events,[51] which, when triggered, cause the Pixel to automatically send users' Sensitive Information directly to Facebook.[52] Examples of events utilized by websites include a user loading a page with a Pixel installed (the "PageView event").[53] The Website utilizes this PageView event.[54]

84. The Meta Pixel also transmits Defendant's unique Pixel ID via the "id" parameter, which contains Defendant's Pixel ID of "163056500755265" for the purpose of matching the harvested data to Defendant's Website.

85. Defendant uses the Meta Pixel to monetize Website users' Sensitive Information.[55]

86. Facebook independently benefits from the data collected through the Meta Pixel by using the harvested data to sell targeted advertising services. Facebook benefits from intercepting and analyzing users' Sensitive Information by

---

[51] *About Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Feb. 17, 2026).
[52] *Id.*
[53] *Specifications for Meta Pixel standard events*, FACEBOOK, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Feb. 17, 2026).
[54] The presence of Pixel events can be confirmed by using the publicly available and free Meta Pixel Helper tool. *See About the Meta Pixel Helper*, FACEBOOK, https://www.facebook.com/business/help/198406697184603?id=1205376682832142 (last visited Feb. 17, 2026).
[55] *See* Exhibit A at 5-7, *Figures 6-8*.

refining its marketing algorithms and improving the effectiveness of its ad sales to all advertisers through Meta's social media platforms, enabling it to target Meta's users more accurately and profit from the ability to more accurately target potential customers. Meta admits that it shares users' Sensitive Information with third parties,[56] just as Plaintiffs' Sensitive Information was shared by the Meta Pixel here.

87. When a business applies to use the Meta Pixel, it is provided with details about its functionality and its impact on private information.[57] Plaintiffs and Website users, however, are not provided this information and would have no reason to look for it, as they are not parties to Defendant's agreement with Facebook.

88. To make use of the Meta Pixel, Defendant agreed to Facebook's Business Tool Terms (the "Facebook Terms").

89. The Facebook Terms inform website owners using the Meta Pixel that the employment of the Meta Pixel will result in data sharing, including with

[56] *See Privacy Policy,* META (Dec. 16, 2025) https://www.facebook.com/privacy/policy?section_id=4-HowDoWeShare (last visited Feb. 26, 2026).

[57] *See Get Started*, META, (last visited Feb. 17, 2026). (The Pixel "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts. Once matched, we can track their actions in the Facebook Ads Manager so you can use the data….By default, the Pixel will track URLs visited [and] domains visited….").

Facebook, through the automatic sharing of Pixel Event information and contact information.[58]

90. The Facebook Terms are transparent that Meta will use the Pixel Event information and contact information "to match the contact information against user IDs, as well as to combine those user IDs with corresponding [Pixel Event information]."[59]

91. Facebook directs parties implementing the Meta Pixel — here, Defendant — to encrypt request information[60] *before* data can be shared.[61]

92. Facebook further provides Meta Pixel users, such as Defendant, guidance on responsible data handling and details how data is acquired, used, and stored, including which information is shared with Facebook.

93. Facebook educates or reminds Meta Pixel users of their responsibility to inform their users of their website's data sharing and specifically guides website

---

[58] *Meta Business Tools Terms*, FACEBOOK (Nov. 3, 2025) https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited Feb. 17, 2026).
[59] *Id.*
[60] This contrasts with Facebook's JavaScript Pixel, which automatically encrypts the data being sent. Defendant has specifically chosen the Facebook Pixel method, which makes users' information visible. *See id.*
[61] *Id.*

owners to obtain the requisite rights, permissions, or consents before sharing information with any third party.[62]

94. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Meta Pixel and ignored Facebook's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' private information.

**C. Google Tracking Tools**

95. Google offers a range of advertising products, each serving a distinct function within advertising portfolios.

**1. Google Ads**

96. Google Ads, formerly AdWords, is an advertising platform developed by Google that allows advertisers to bid to display advertisements, service offerings, product listings, or videos to web users.[63]

97. The process by which advertisers using Google Ads display ads within text-based search results is as follows: (i) advertisers create text-based ads with a title, description, and a link to the website to place within the Google search results;

---

[62] *Best practices for privacy and data use for Meta Business Tools*, META, https://www.facebook.com/business/help/363303621411154?id=818859032317965 (last visited Feb. 17, 2026).

[63] *Achieve all your goals in one place*, GOOGLE, https://ads.google.com/home/goals/ (last visited May 6, 2026).

(ii) advertisers then choose keywords, usually related to their business or target audience, intended to trigger their ads to appear within the user's search results;[64] (iii) Google then allows advertisers to bid on those various keywords;[65] (iv) the advertiser with the highest bid wins the auction, and the ad is displayed on the search results page; and (v) the winning ad appears above or below the organic search results and is marked as an ad.

98. Google AdSense works in conjunction with the Google Ads bidding system and allows website owners to display Google Ads on their websites and earn a revenue share when ads are viewed or clicked.[66] The search terms bid on through Google Ads are used by website owners participating in Google AdSense, allowing those owners to share in advertising revenue generated by Google.

99. AdSense for content or AdSense for search are methods by which AdSense functions.[67] In either configuration, AdSense matches advertisements to website users based on website content and user activity.

100. Google Ads intercepted Plaintiffs' searches and page views on the

---

[64] *Be just a Google Search away*, GOOGLE, https://ads.google.com/home/campaigns/search-ads/ (last visited May 6, 2026).
[65] *Id.*
[66] *Google AdSense Home*, GOOGLE, https://www.google.com/adsense/start/how-it-works/ (last visited May 6, 2026).
[67] *AdSense revenue share*, GOOGLE, https://support.google.com/adsense/answer/180195?hl=en (last visited May 6, 2026).

Website and transmitted them to Google.[68]

101. Google benefits when website owners utilize Google Ads and Google AdSense in connection with their websites.

102. Through Google AdSense, Google aggregates search data collected from website users. Google uses that data to improve its services and deliver more relevant search results. By analyzing patterns and trends in visitor behavior, Google gains insight into what users search for and what interests them. That insight supports service improvements, product development, and revenue growth.

103. Google's collection and analysis of search results also allows it to improve its machine learning algorithms.[69] Google uses data on how users interact with search results to train its algorithms to provide more accurate and relevant search results.[70] For example, when a user clicks on a particular search result and spends more time on that page, Google treats that interaction as a signal of relevance to the search query. By aggregating such data across users, Google can develop advertising profiles that include demographic and interest-based attributes, such as age range, industry, and interests.[71]

---

[68] *See* Exhibit A at 13-17, *Figures 19-24*.
[69] Elle Poole Sidell, *What Does Google Do With Your Data?*, AVAST (Dec. 18, 2020) https://www.avast.com/c-how-google-uses-your-data (last visited May 6, 2026).
[70] *Id.*
[71] *Id.*

104. Google profits in several ways from the Website's use of the Google search engine: (i) advertisers bid and pay Google for the keywords that will result in their ads showing in search results; (ii) through AdSense search, every time a user clicks or views an ad (depending on their chosen method), the advertiser will pay Google for that click or view; and (iii) Google's ability to aggregate user search data allows Google to further tailor its products to advertisers and users by training its algorithms on large volumes of search data.

**2. Google analytics**

105. Google Analytics ("GA") collects data about visitor interactions with a website. That data includes link clicks, button clicks, form submissions, conversions, shopping cart abandonment, items added to or removed from carts, file downloads, scrolling behavior, video views, call-to-action performance, table-of-contents clicks, and other customizable events.[72]

106. GA transmits collected interaction data to Google, which associates the activity with the website that generated it.[73] Notably, Google notifies web developers that developers should provide "users with clear and comprehensive

---

[72] Zach Paruch, *What Is Google Tag Manager & How Does It Work?*, SEMRUSH BLOG (Jan. 4, 2024) https://www.semrush.com/blog/beginners-guide-to-google-tag-manager/ (last visited May 6, 2026).
[73] *About the Google tag*, GOOGLE, https://support.google.com/tagmanager/answer/11994839?hl=en (last visited May 6, 2026).

information about the data…collect[ed] on [their] websites" and to obtain "consent for that collection where legally required."[74]

107. GA functions through specific collection settings and fixed data transmission paths. Google acknowledges the legal implications of those practices and assigns responsibility for visitor disclosure to website developers, including Defendant.

108. Here, Defendant added GA to the Website. That implementation caused Plaintiffs' webpage views to be intercepted and transmitted to Google.[75].

109. After the data reaches those common destinations, Google products analyze the information and provide feedback that allows Defendant to monetize the collected data through targeted advertising.

**D. The Pinterest Tag**

110. Defendant installed a tracking pixel on its Website created by the social media site, Pinterest (the "Pinterest Tag").

111. The Pinterest Tag is a piece of code a website owner can add to their site to track visitors and record their actions, so they can later target them with ads on Pinterest.[76]

---

[74] *Id.*
[75] *See* Exhibit A at 17-19, *Figures 25-27*.
[76] *Install the Pinterest tag*, PINTEREST, https://help.pinterest.com/en/business/article/install-the-pinterest-tag (last visited Dec. 22, 2025).

112. To use the Pinterest Tag, a website owner must include the Pinterest Tag ID in the base code of their website.[77]

113. The Pinterest tag ID identifies which code needs to be sent to the user's browser to track website owner-designated data points through specified "events,"[78] and to establish which Pinterest account will receive the data upon collection.[79]

114. Once a website owner adds the base code of the Pinterest Tag, they can add "event codes" so the Pinterest Tag tracks specific actions visitors take on their website, such as viewing a page, watching a video, checking out, and other specified events.[80]

115. The Pinterest Tag begins intercepting user information as soon as it

---

[77] *Add the base code to your website*, PINTEREST, https://help.pinterest.com/en/business/article/install-the-base-code (last visited Dec. 22, 2025).

[78] *Add event* codes, PINTEREST, https://help.pinterest.com/en/business/article/add-event-codes (last visited Dec. 22, 2025).

[79] *See Add the base code to your website*, PINTEREST, https://help.pinterest.com/en/business/article/install-the-base-code (last visited Dec. 22, 2025); *Set up the Pinterest tag with Google Tag Manager*, https://help.pinterest.com/en/business/article/google-tag-manager-and-pinterest-tag (highlighting that integrating Pinterest Tags with third-party data tracking systems requires a Pinterest tag ID to know which Pinterest conversion account should receive the tracked data) (last visited Dec. 22, 2025).

[80] *Add event* codes, PINTEREST, https://help.pinterest.com/en/business/article/add-event-codes (last visited Dec. 22, 2025).

loads in users' browsers.[81]

116. Website owners, like Defendant, then send the collected information to Pinterest. Pinterest recommends that website owners transmit the IP address of website visitors for all conversion events.[82]

117. Without implementing any other features, the Pinterest Tag tracks and transmits the URL currently being viewed by the website visitor. Additionally, the Pinterest Tag reads and uses first-party cookies to identify the Pinterest user currently viewing the website through a personalized Pinterest "User ID," even when the user is logged out of Pinterest.[83]

118. Website owners can also, in conjunction with the Pinterest Tag, enable a feature called "automatic enhanced match" to identify the exact identities of Pinterest users who visit the website.[84]

---

[81] *Pinterest tag*, PINTEREST, https://developers.pinterest.com/docs/api-features/pinterest-tag/#:~:text=The%20Pinterest%20Tag%20allows%20you,Pinterest%20Tag%20has%20two%20components (last visited Dec. 22, 2025).
[82] *Track conversion events*, PINTEREST, https://developers.pinterest.com/docs/api-features/track-conversion-events/ (last visited Dec. 22, 2025).
[83] *View tag parameters and cookies*, PINTEREST, https://help.pinterest.com/en/business/article/pinterest-tag-parameters-and-cookies (last visited Dec. 22, 2025).
[84] *Enable automatic enhanced match*, PINTEREST, https://help.pinterest.com/en/business/article/automatic-enhanced-match (last visited Dec. 22, 2025).

119. When used in conjunction with automatic enhanced match, the Pinterest Tag collects and transmits to Pinterest the following user data:

- Email addresses;
- First and last names;
- Phone numbers;
- Genders;
- Birth dates;
- External IDs, and address location information such as city, state, zip code, and country.[85]

120. This data can be used by Pinterest to "match more of [a] website['s] visitors and conversions to people on Pinterest, which can lead to improvements in [ad] campaign performance…and audience reach…."[86]

121. Pinterest uses this data to help advertisers like Defendant gauge the effectiveness of their ad campaigns, optimize the return on their ad spending, and broaden their audience reach.[87]

---

[85] *Id.*
[86] *Id.*
[87] *Id.*

122. The Pinterest Tag also sends the "tid" parameter, which identifies the website owner's Pinterest Tag ID.[88] Here, the "tid" parameter, found in Pinterest Tag transmissions from Defendant's site, contains Defendant's Pinterest tag ID of "2619880083650." This data is sent both when the Website receives communications and when users send communications to the Website.[89]

123. Additionally, unless websites use a specific "limited data processing flag," Pinterest uses this data, such as names, phone numbers, emails, and IP addresses, to conduct research on Pinterest usage and to market its own services.[90]

124. Pinterest also sends the data to its business partners and other vendors.[91]

125. When a website owner applies to Pinterest to use the Pinterest Tag, the website owner must agree to Pinterest's Developer and API Terms of Service

---

[88] Pinterest tag parameters and cookies, https://help.pinterest.com/en/business/article/pinterest-tag-parameters-and-cookies (last visited Dec. 12, 2025). *Pinterest tag parameters and cookies*, PINTEREST, https://help.pinterest.com/en/business/article/pinterest-tag-parameters-and-cookies (last visited Dec. 22, 2025).

[89] *See* Exhibit A at 11-13, *Figures 16-18*.

[90] *Limited data processing*, PINTEREST, https://help.pinterest.com/en/business/article/limited-data-processing (last visited May 17, 2025).

[91] *California Privacy Statement and Notice at Collection*, PINTEREST, https://policy.pinterest.com/en/notice-at-collection (last visited Dec. 22, 2025).

(the "Pinterest Terms"), part of which requires agreeing that Pinterest may collect and use website users' information.[92]

126. The Pinterest Terms further provide Pinterest Tag users, like Defendant, with guidance on their privacy responsibilities.

127. Pinterest directs parties implementing the Pinterest Tag, such as Defendant, to clearly disclose their data practices and obtain their users' consent where required by law.[93]

128. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Pinterest Tag, and ignored Pinterest's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' private Sensitive Information.

**E. The Twitter Pixel**

129. X Corp. f/k/a Twitter ("Twitter") also offers its own website tag that can be implemented into websites to track users' site actions or conversions (the "Twitter Pixel").

---

[92] *Developer and API Terms of Service*, PINTEREST, https://developers.pinterest.com/terms/ (last visited Dec. 22, 2025).
[93] *Id.*

130. To make use of the Twitter Pixel, website owners, such as Defendant, must take several affirmative steps: They must generate the Twitter Pixel and create events to track, implement the Twitter Pixel base code across their website, and implement event code in key locations on their website, like when a user makes a purchase.[94]

131. With each event, website owners like Defendant can select the user action they want Twitter to track and the parameters to describe the action being tracked.

132. Events can include viewing a page, making a purchase, adding an item to the shopping cart, using the search bar, adding a product to the wish list, adding payment information, and customizing a product.[95]

133. Parameters can include the contents of the action, the search terms used on the website, the email address of the user taking the action, the value of the product purchased, and the currency the purchase was made in.[96]

134. As soon as the Twitter Pixel is placed on a website, it begins to collect information, including the cookie IDs of users, to match them to Twitter users for

[94] *X Pixel*, X BUSINESS, https://business.x.com/en/help/campaign-measurement-and-analytics/conversion-tracking-for-websites (last visited Sept. 17, 2025).
[95] *Event Types and Parameters*, X BUSINESS, https://business.x.com/en/help/campaign-measurement-and-analytics/conversion-tracking-for-websites (last visited Feb. 17, 2026).
[96] *Id.*

the purpose of developing custom audiences and improving marketing and advertising capabilities of the website and Twitter.[97][98]

135. Twitter admits that it shares users' Sensitive Information with third parties,[99] just as Plaintiffs' Sensitive Information was shared here.

136. Twitter allows website owners, such as Defendant, to create "Website Activity Audiences," a type of custom audience, which enables Twitter to collect and analyze user activity for users who have visited or taken certain actions on Defendant's Website. Once an audience is created and the Twitter Pixel collects 100 Twitter users, the audience will be ready to use for targeting in ad campaigns.[100]

137. The data collected by the Twitter Pixel informs both Defendant and Twitter how to optimally target custom audiences with advertising based on the geo, gender, age, and device criteria specified by Defendant. The Twitter Pixel instantly sends communications to Twitter from users' browsers to add to its collection of user behavior when a user visits any page on the Website.

---

[97] *Website Activity Custom Audiences*, X BUSINESS, https://business.x.com/en/help/campaign-setup/campaign-targeting/custom-audiences/website-activity (last visited Feb. 17, 2026).
[98] *See* Exhibit A at 9-11, *Figures 13-15*.
[99] *See Privacy Policy*, X (Jan. 15, 2026) https://x.com/en/privacy (last visited Feb. 26, 2026).
[100] *Id.*

138. Twitter is transparent that Twitter will process users' data to match contact details against corresponding accounts and subsequently match those accounts with the users' corresponding event data.[101]

139. To use the Twitter Pixel, Defendant agreed to Twitter's policies for conversion tracking and custom audiences (the "Twitter Terms").[102] But the Twitter Terms are not provided to Website users.

140. Twitter obligates Twitter Pixel users, such as Defendant, stating that they "must provide their application customers with legally sufficient notice that they are working with third parties to collect customer data through their application for purposes of conversion tracking and serving ads targeted to customers' interests, and obtain legally sufficient consent from their customers for these activities."[103]

141. Twitter makes clear that the onus is on the Defendant to provide all necessary transparency notices and obtain all necessary rights, permissions, and lawful bases, including consent, to share information with Twitter.[104]

---

[101] *Website Activity Custom Audiences*, X BUSINESS (last visited Feb. 24, 2026).
[102] *Policies for conversion tracking and custom audiences*, X BUSINESS, https://business.x.com/en/help/ads-policies/campaign-considerations/policies-for-conversion-tracking-and-custom-audiences (last visited Feb. 24, 2026).
[103] *Id.*
[104] *Id.*

142. Twitter educates or reminds Twitter Pixel users of their obligation to be honest with their consumers and not to select "targeting criteria that could reveal sensitive information" about consumers.[105]

143. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Twitter Pixel and ignored Twitter's warnings to safely handle its users' data and warn its users that the Website would disclose their information in a manner that threatened their Sensitive Information.

## IV. The Website's Cookie Banners Misled Users

144. When users in locations such as New York visited the Website, the Website immediately displayed a Cookie Banner One informing users that the Website uses cookies to enhance user experience and analyze performance and traffic on the Website, and that Defendant also shares information about users' use of the Website with its social media, advertising, and analytics partners. The banner provided users with the option to "Accept All Cookies," "Reject All," or access "Cookie Settings" to manage their cookie preferences.

145. Website users who selected the "Cookie Settings" option were presented with a cookie consent preferences window, which represented that users could control how their personal information was collected, used, sold, or shared

[105] *Id.*

by adjusting the individual cookie toggles and clicking "Confirm My Choices" or by clicking "Reject All." Defendant represented to users, in substance, that they could exercise their right to stop the sale or sharing of personal information by using the toggles or "Reject All" to reject unnecessary cookies, and that if users rejected the cookies, Defendant would not provide personalized advertising and would not expose users' personal information to third parties through the use of cookies.

146. After users rejected all cookies other than those strictly necessary and clicked "Confirm My Choices" or clicked "Reject All," users were permitted to continue browsing the Website. At that point, Cookie Banner One and the New York Cookie Settings window disappeared.

147. Defendant's Cookie Banner One and New York Cookie Settings representations led Plaintiffs, and would reasonably lead all Website users similarly situated, to believe that they had successfully disabled all non-essential cookies and the sale or sharing of their information. The banner and preference window further reasonably led Plaintiffs and all reasonable users to believe that Defendant would not allow third parties, through cookies or similar technologies, to access users' personal information on the Website.

148. These representations were false. In reality, Defendant did not abide by users', including Plaintiffs', expressed preferences. When users chose to disable

the sharing of their personal information and to decline all non-essential cookies other than those strictly necessary, they clearly communicated that they did not consent to the placement or transmission of Tracking Tools, including optional cookies. Nevertheless, Defendant continued to cause the Tracking Tools, including the aforementioned cookies, to be placed on users' browsers and devices so that Tracking Entities could intercept, transmit, and use users' Sensitive Information.

149. Specifically, even after users rejected all unnecessary cookies, Defendant continued to cause cookies, pixels, and similar technologies to be placed on users' devices and/or transmitted to third parties, here the Tracking Entities, resulting in the real-time collection of user data that disclosed Website users' Sensitive Information. In other words, even after users attempted to protect their privacy by not accepting the use of cookies, Defendant continued to use cookies to transmit user data to the Tracking Entities.[106]

150. Further, for users in different locations such as California and Colorado, Defendant's Website displayed a cookie banner that substantially differs from Cookie Banner One. When users in those locations visited the Website, the Website immediately displayed a pop-up cookie consent banner, which informed users that the Website used cookies and that information about users' interactions with the Website is shared with social media, advertising, and analytics partners in

[106] *See* Exhibit A at 19-31, *Figures 28-45*.

a manner identical to Cookie Banner One. Cookie Banner Two only presented users with the options to "Accept Cookies" or to access the California and Colorado Cookie Settings through a "Do Not Sell My Personal Information" button.

151. This banner is different than the one shown to users in New York. Users in California and Colorado are told that they can prevent their personal information from being sold in any way, through cookies or other methods.

152. This was false. When users use the California and Colorado Cookie Settings to reject all tracking, their personal information continues to be sold or shared with the Tracking Entities.

153. The Tracking Tools that Defendant caused to be loaded and executed by users' browsers function as an unlawful wiretap when they are executed because they enable Tracking Entities, separate and distinct parties from Defendant, to eavesdrop on, record, extract, analyze, and exploit users' Sensitive Information. The Tracking Entities are not mere passive tools or instruments of the Defendant; they independently collect, analyze, and use the intercepted communications for their own commercial purposes.

## V. Defendant Violated CIPA and the Federal Wiretap Act

### A. Tracking Entities Improperly Intercepted and Learned the Contents of Communications in Transit

154. Transmitted URLs that include both the path and query string reflect the substance of a user's communication and therefore constitute content.

155. Here, the network requests intercepted by the Tracking Entities included detailed Request URLs containing the names and file locations of webpages, products users browsed on the Website, identifying information in the form of cookies, in addition to user activity information that indicates users' commercial activity and purchases.

156. The Tracking Tools intercepted the contents of Plaintiffs' communications, including their browsing history and search terms, contemporaneously with Plaintiffs' interactions with the Website. The Tracking Tools began transmitting data to the Tracking Entities as soon as the Tools loaded onto Plaintiffs' browsers, and additionally transmitted data at the moment Plaintiffs submitted information through the Website.

157. This interception, duplication, and transmission occurred inside Plaintiffs' browsers, before the communications fully reached users' devices, or otherwise before the communications were transmitted from users' devices and therefore occurred while the communications were in transit.

158. The Tracking Entities were third parties to Plaintiffs' communications with Defendant, and intercepted, read, duplicated, and retransmitted users' data while it was in transit.

159. Defendant's deployment of the Tracking Tools enabled Tracking Entities to intercept Request URLs that specified the content Plaintiffs accessed on

the Website, in violation of CIPA § 631 and the Federal Wiretap Act 18 U.S.C. § 2511(1)(a).

160. In short, Plaintiffs communicated with the Website, specifying which webpages they wanted to access. The Tracking Tools intercepted those communications in transit and transmitted them to the Tracking Entities.

**B. Defendant Aided Tracking Entities' Interceptions**

161. A party violates CIPA § 631 and the Federal Wiretap Act 18 U.S.C. § 2511(1)(a) not only by directly intercepting communications, but also by knowingly permitting or facilitating third-party interception.

162. Defendant knowingly procured the Tracking Entities to embed the Tracking Tools in its Website, enabling the Tracking Entities to intercept the contents of Plaintiffs' communications with the Website.

163. Defendant actively configured the Website to include the Tracking Tools. The Tracking Tools were placed and installed by Defendant and would not have been able to intercept Plaintiffs' communications if Defendant did not install them.

164. The Tracking Tools were placed pursuant to agreements between Defendant and the Tracking Entities. Defendant and the Tracking Entities each benefited from the placement of the Tracking Tools.

165. CIPA § 631(a) requires the prior consent of all parties to the communication.

166. The Federal Wiretap Act 18 U.S.C. § 2511(2)(d) requires the prior consent of at least one party to the communication.

167. Defendant did not obtain Plaintiffs' express or implied consent to allow the Tracking Entities to intercept those communications, before or after the interceptions occurred, and Defendant's consent was limited to the Terms provided by the Tracking Entities.

### C. Defendant Used Improperly Intercepted Communications for Analytics and Marketing

168. California and federal law prohibit the use of improperly intercepted communications. *See, e.g.*, Cal. Penal Code § 631(a); 18 U.S.C. § 2511(1)(d).

169. Defendant made use of the Sensitive Information intercepted by Tracking Entities for marketing purposes, such as targeted advertising aimed at its users, including Plaintiffs.

170. Defendant was made aware of how the Tracking Tools operated, how information would be collected from Plaintiffs' devices, and implemented the Tracking Tools in a way that resulted in the Tracking Entities intercepting Plaintiffs' Sensitive Information.

171. Plaintiffs' Sensitive Information was then processed by Tracking Entities into marketing profiles of Defendant's users, including Plaintiffs, which

Defendant then used to improve its marketing efforts and target users, including Plaintiffs, with advertising.

### D. The Tracking Tools are Trap and Trace and/or Pen Register Devices

172. California law defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

173. California law defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

174. The Tracking Tools are processes to identify the source of electronic communication by capturing incoming electronic impulses and identifying dialing, routing, addressing, and signaling information generated by users, who are never informed that the website is collaborating with the Tracking Entities to obtain their phone number and other identifying information. As such, they are "trap and trace" devices.

175. The Tracking Tools are "reasonably likely" to identify the source of incoming electronic impulses. In fact, they are designed specifically for that purpose. The IP addresses, detailed URLs, cookies, and Pixel IDs disclosed through the use of the Tracking Tools identify: (i) the source and destination of incoming signals to Plaintiffs' devices to the Tracking Entities; and (ii) the source and destination of outgoing signals from Plaintiffs' devices.

176. Defendant did not obtain Plaintiffs' express or implied consent to be subjected to data sharing with the Tracking Tools for the purposes of fingerprinting and de-anonymization.

177. CIPA imposes civil liability and statutory penalties for the installation of trap and trace software without a court order. California Penal Code § 637.2. No court order to install a trap and trace device via the Tracking Tools was obtained by Defendant.

178. Defendant did not obtain Plaintiffs' or the Class Members' express or implied consent to be subjected to data sharing with the Tracking Entities for the purposes of fingerprinting and de-anonymization, nor did Defendant obtain a court order.

**E. Defendant Misrepresented the Effectiveness of Cookie Controls**

179. Plaintiffs' investigation revealed that the Website's default settings permitted tracking to begin as soon as users interacted with the Website, before users clicked "Accept All Cookies" or "Accept Cookies" on the cookie banner.

180. As a result, users were tracked as soon as they began to use the Website, without prior consent.

181. Plaintiffs visited the Website while those default tracking settings were active.

182. Users who visit the Website in locations such as New York are shown a cookie banner offering the option to reject unnecessary cookies.

183. Users in locations such as California were told that they could reject the sale of their personal information.

184. All users were told that "Targeting Cookies" did not share personally identifiable information.

185. Despite those representations, users in locations such as New York who did not accept any additional cookie categories had their communications intercepted by the Tracking Tools. In all locations, even users who declined all unnecessary cookies or rejected the sale of their personal information continued to be tracked by at least Google, Twitter, and TikTok.

186. Defendant intentionally placed the Google, Twitter, and TikTok Tracking Tools on the Website and configured the Website to allow the Tracking Entities to track users and intercept their communications with the Website, despite stating in the Cookie Settings that tracking cookies would not be utilized if users rejected unnecessary cookies.

187. Despite Defendant's representations, the "Targeting Cookies" from Meta contained personally identifiable information in the form of the FID in the c_user cookie discussed *supra*.

188. Representations regarding cookie-consent controls are materially misleading where Defendant misrepresents the capabilities of the Tracking Tools, the scope of tracked information, and that tracking continues despite users' opt-out selections.

189. Defendant and the Tracking Entities benefited from the interception of Plaintiffs' communications by reading and subsequently using the intercepted contents reflecting Plaintiffs' browsing habits and interests, combining that information with tracking information gathered about Plaintiffs by the same Tracking Tools on separate websites across the internet, and using that combined

information to construct detailed profiles of Plaintiffs and using those profiles for targeted advertising.[107]

190. The Tracking Entities independently benefit from the interception of communications, using data collected through the Tracking Tools to improve their advertising products and market those capabilities to other businesses.[108]

## CLASS ALLEGATIONS

191. Plaintiffs bring these claims for relief pursuant to the Federal Rules of Civil Procedure 23(a), 23(b)(2), or 23(b)(3) on behalf of the following Class and Subclass:

192. Plaintiffs bring this class action individually and on behalf of the following Class:

> All natural persons in the United States who visited and interacted with Defendant's Website, encountered a cookie banner, and rejected the Website's use of non-essential cookies via the cookie banner or cookie settings, and whose Sensitive Information was intercepted, disclosed,

---

[107] *See About Advanced Matching for Web*, TIKTOK, https://ads.tiktok.com/help/article/advanced-matching-web?lang=en (last visited Feb. 17, 2026); *Meta Pixel*, FACEBOOK, https://www.facebook.com/business/tools/meta-pixel (last visited Feb. 17, 2026); *Enable automatic enhanced match*, PINTEREST, https://help.pinterest.com/en/business/article/automatic-enhanced-match (last visited Feb. 17, 2026).

[108] *See TikTok Business Products (Data) Terms*, TIKTOK (July 29, 2024) http://ads.tiktok.com/i18n/official/policy/business-products-terms(last visited Feb. 17, 2026); *Meta Business Tools Terms*, FACEBOOK (Apr. 25, 2023) https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited Feb. 17, 2026).

> and/or transmitted to the Tracking Entities via the Website's use of the Tracking Tools (the "Class" or "Nationwide Class").

193. Plaintiff Corona-Cantu brings this class action individually and on behalf of the following California Subclass:

> All members of the Nationwide Class who visited and interacted with Defendant's Website while located in the State of California (the "California Subclass").

194. Specifically excluded from the Class are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

195. Plaintiffs reserve the right to amend the Class and Subclass definitions above if further investigation and/or discovery reveal that the Class and/or Subclass should be expanded, narrowed, further divided into subclasses, or otherwise modified in any way.

196. NUMEROSITY: At this time, Plaintiffs do not know the number of Class or Subclass Members but believe the number to be at least measured in thousands, if not millions, given the popularity of Defendant's Website. The number of persons within the Class and Subclass is believed to be so numerous that

joinder of all members is impractical. The exact identities of the Class and Subclass Members may be ascertained via the records maintained by Defendant.

197. COMMONALITY: Common questions of fact and law exist as to all of the Class Members and Subclass Members and predominate over any questions affecting only individual members of the Class or Subclass. Such common legal and factual questions, which do not vary between the Class Members, and which may be determined without reference to the individual circumstances of any Member of the Class, include but are not limited to the following:

a. Whether Defendant exposed the Class Members' personal information to the Tracking Entities or other third parties by making use of the Tracking Tools;

b. Whether Defendant obtained effective and informed consent to do so;

c. Whether the Class Members are entitled to statutory penalties; and

d. Whether the Class Members are entitled to injunctive relief.

198. TYPICALITY: As persons who visited Defendant's Website and whose personal information was shared by Defendant, Plaintiffs are asserting claims that are typical of the Class and Subclass, respectively.

199. ADEQUACY: Plaintiffs will fairly and adequately protect the interests of the members of the Class and Subclass. Plaintiffs have retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

200. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all of the Class and Subclass Members is impracticable and inefficient. It would be unduly burdensome on the courts, where individual litigation of numerous cases would proceed. If Class treatment of these claims is not available, Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

## CAUSES OF ACTION

## COUNT I

### VIOLATION OF THE WIRETAP ACT
### 18 U.S.C. § 2510, et seq.
### (On Behalf of Plaintiffs and the Nationwide Class)

201. Plaintiffs incorporate the above allegations as if fully set forth herein.

202. The federal Wiretap Act, codified at 18 U.S.C. § 2510, et seq. (the "Wiretap Act"), prohibits the intentional interception of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. 18 U.S.C. § 2511.

203. The Wiretap Act provides a private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

204. The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

205. The Wiretap Act defines "contents" as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

206. The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

207. The Wiretap Act defines "person" to include any individual, partnership, association, trust, or corporation. 18 U.S.C. § 2510(6).

208. Defendant is a "person" within the meaning of the Wiretap Act.

209. The Tracking Tools embedded on Defendant's Website constitute "device[s]" or "apparatus[es]" capable of intercepting wire, oral, or electronic communications within the meaning of 18 U.S.C. § 2510(5).

210. Plaintiffs had a reasonable expectation of privacy in their electronic communications with Defendant's Website, including their searches, browsing activity, and shopping-related interactions, particularly where Defendant represented through its Cookie Banner Two, California and Colorado Cookie Settings, and Privacy Policy that users could opt out of the sale/sharing of personal information and decline unnecessary cookies.

211. The reasonable expectation of privacy depends on the nature of the contents intercepted. Communications reflecting users' choices, intent, and behavior on commercial websites, such as searches, browsing, and order interactions, are sensitive and convey the substance and meaning of the communication.

212. A reasonable user is entitled to assume that any disclosure of the contents of his communications occurs lawfully and with consent. To hold otherwise would require users to assume their privacy will be violated as a matter of course.

213. Plaintiffs reasonably expected that Tracking Entities were not intercepting, recording, or using the contents of their electronic communications with Defendant's Website without their consent.

214. Within the relevant time period, Plaintiffs' electronic communications with the Website were intercepted contemporaneously at the moment they were

sent by the Tracking Tools and transmitted to Tracking Entities without Plaintiffs' consent, for the unlawful purpose of monetizing the Plaintiffs' intercepted Sensitive Information, including for combining that information with information collected about Plaintiffs from across the internet and used for advertising, analytics, and marketing optimization.

215. Interception occurred whenever Plaintiffs interacted with the Website, including when they navigated webpages, used search or location features, viewed products, placed an order, or otherwise communicated information to the Website through their browsers.

216. At all relevant times, Defendant's conduct was knowing, willful, and intentional. Defendant is a sophisticated commercial entity that knowingly embedded and enabled the Tracking Tools on its Website and understood that doing so would result in the interception and transmission of users' communications to Tracking Entities.

217. Plaintiffs were not asked for consent before the Tracking Entities intercepted, recorded, disclosed, or used their electronic communications with the Website. To the contrary, Plaintiffs either affirmatively declined optional tracking through Defendant's Cookie Settings when notified or were told by Defendant that their lack of consent would prevent the interception, recording, disclosure, or use of their electronic communications with the Website by the Tracking Entities.

218. The unauthorized interception and use of Plaintiffs' electronic communications by the Tracking Entities was only possible because Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Website. 18 U.S.C. § 2511(1)(a).

219. Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Website and allowed Tracking Entities to intercept the communications of users on the Website, for Defendant and Tracking Entities to subsequently use those intercepted communications after being processed by the Tracking Entities. Tracking Entities' interceptions were conducted despite Defendant's representations in Cookie Banner One and Cookie Banner Two, in contravention of the Tracking Entities' terms. The interception and use of users' Sensitive Information without their consent invaded their privacy and violated state and federal laws protecting their privacy and preventing unfair and fraudulent business practices.

220. As a direct and proximate result of Defendant's violations of the Wiretap Act, Plaintiffs and the members of the Nationwide Class have been damaged and are entitled to relief under 18 U.S.C. § 2520, including:

a. damages in an amount to be determined at trial, assessed as the greater of actual damages suffered by Plaintiffs and any profits made by the intercepting parties as a result of the violations, or

b. statutory damages of the greater of $100 per day per violation or $10,000; appropriate equitable and declaratory relief; and

c. reasonable attorneys' fees and costs.

## COUNT II

## COMMON LAW INVASION OF PRIVACY
### Intrusion Upon Seclusion
### (On Behalf of Plaintiffs and the Nationwide Class)

221. Plaintiffs incorporate the above allegations as if fully set forth herein.

222. Plaintiffs bring this cause of action on behalf of themselves and all members of the Nationwide Class.

223. Defendant has intruded upon the legally protected privacy interests of Plaintiffs and the members of the Nationwide Class by, among other things, permitting third-party tracking technologies to collect, track, and compile users' Sensitive Information while representing to users that they could opt out of such collection.

224. Plaintiffs and the members of the Nationwide Class maintained a reasonable expectation that their communications with Defendant via the Website would remain private, specifically with respect to their personal information,

including browsing activity, device identifiers, and related metadata, which has been recognized as sensitive information.[109]

225. Plaintiffs and the members of the Nationwide Class relied on Defendant's representations and did not accept the use of Tracking Tools, reasonably expecting that Defendant would honor its affirmative representation in the cookie banner that users could avoid tracking by not opting into the sale/sharing of personal information and rejecting unnecessary cookies.

226. Despite the fact that Plaintiffs and the members of the Nationwide Class did not authorize such tracking, Defendant permitted Tracking Entities to use cookies and related Tracking Tools to collect and compile users' Sensitive Information, including the categories described above. The Tracking Entities used and profited from these data to create detailed user profiles, audience segments, and targeted advertising, and to share and monetize those profiles.

227. Defendant lacked any legitimate business justification for permitting the placement and transmission of the third-party cookies and Tracking Tools that

[109] For example, California voted to pass the California Consumer Privacy Act of 2018 ("CCPA") and voted to amend the CCPA in 2020 through Proposition 24, the California Privacy Rights Act (CPRA). The CPRA requires businesses to provide adequate notice of the collection and use of "personal information," including real names, online identifiers, internet browsing and search history, location data, audio and visual information, etc. *See generally,* Cal. Civ. Code §§ 1798.100, 1798.105, 1798.106, 1798.110, 1798.115, 1798.120, 1798.140(v).

allowed Tracking Entities to access, intercept, and collect users' Sensitive Information, contrary to users' express opt-outs.

228. As a direct and proximate result of Defendant's conduct, Plaintiffs and the members of the Nationwide Class suffered injury, including but not limited to loss of privacy, loss of control over their personal information, diminution in value of their private data, and other compensable harms.

229. Plaintiffs and the members of the Nationwide Class seek all available relief for this claim, including compensatory damages, restitution, disgorgement of profits, statutory and punitive damages where available, and injunctive relief to prevent further unlawful tracking.

## COUNT III
## INVASION OF PRIVACY AND VIOLATION OF THE CALIFORNIA CONSTITUTION, Art. 1, § 1
## (On Behalf of Plaintiff Corona-Cantu, and the California Subclass)

230. Plaintiff Corona-Cantu incorporates the above allegations as if fully set forth herein.

231. Plaintiff Corona-Cantu brings this cause of action on behalf of herself and all California Subclass Members.

232. Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting

property, and pursuing and obtaining safety, happiness, and privacy." California Constitution, Article I, Section 1.

233. California voters added the word "and privacy" to the California Constitution when they passed Proposition 11 in 1972. Proposition 11 is also known as the "Privacy Initiative" or "Right to Privacy Initiative."

234. In support of Proposition 11, voters stated that:

> The right of privacy is the right to be left alone … It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control circulation of personal information. This is essential to social relationships and personal freedom.

235. Plaintiff Corona-Cantu and the California Subclass Members have a legally protected interest in their Sensitive Information, such as browsing activity, device identifiers, and related metadata, which Defendant violated by providing the Tracking Entities with access to that data, thereby enabling the interception of such communications. Plaintiff Corona-Cantu's and California Subclass Members' protected interests arise from various statutes and common law, including, inter alia, the Wiretap Act, the CIPA, and the California Constitution, which protects privacy rights and includes the "ability to control circulation of our personal information."

236. The privacy rights of Plaintiff Corona-Cantu and the California Subclass Members were invaded through the interception and collection of their data, which included their Sensitive Information and other sensitive information, without first obtaining authorization or consent from Plaintiff Corona-Cantu and the California Subclass Members.

237. Plaintiff Corona-Cantu and the California Subclass Members had a reasonable expectation of privacy when communicating with Defendant's Website and thereby providing their Sensitive Information.

238. By causing third-party cookies and Tracking Entities to be placed on users' browsers and devices and by transmitting users' Sensitive Information to third parties despite users' choice to opt out of the sale of their personal information and reject unnecessary cookies, Defendant violated their reasonable expectation of privacy.

239. Defendant's intrusion, placing third-party Tracking Tools and enabling third-party access to users' Sensitive Information despite users' express rejection of such tracking, is and would be highly offensive to a reasonable person.

240. As a direct and proximate result of Defendant's intentional invasion of their privacy rights, Plaintiff Corona-Cantu and the California Subclass Members have been harmed and are entitled to compensatory, punitive, and injunctive relief.

## COUNT IV

## VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT Cal. Penal Code § 631 (On Behalf of Plaintiff Corona-Cantu and the California Subclass)

241. Plaintiff Corona-Cantu incorporates the above allegations as if fully set forth herein.

242. Plaintiff Corona-Cantu brings this cause of action on behalf of herself and all California Subclass Members.

243. CIPA provides that a person is liable to another where, one "by means of any machine, instrument, contrivance, or in any other manner," committed any of the following: (i) intentionally tapped, or made any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, cable, or instrument of any internal telephonic communication system; or (ii) willfully and without consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or being sent from or received at any place within this state; or (iii) uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or (iv) aids, agrees with, employs, or conspires with any

person or persons to unlawfully do, or permit or cause to be done any of the acts or things mentioned above in this section. Cal. Penal Code § 631(a).

244. The Website, including the Tracking Tools placed upon it, is a "machine, instrument, contrivance, or…other manner" used to engage in the prohibited conduct at issue here.

245. Within the relevant time period, Defendant, without the consent of all parties to the communication, or in any unauthorized manner, willfully read or attempted to read or learn the contents or meaning of electronic communications of Plaintiff Corona-Cantu and the California Subclass Members, contemporaneous with the communications' transit through or passing over any wire, line or cable or with the communications being sent from or being received at any place within California. The information collected by the Tracking Tools was not for the sole benefit of Defendant.

246. Within the relevant time period, Defendant aided, agreed with, conspired with, and employed the Tracking Entities to implement the Tracking Tools and to violate CIPA § 631.

247. Within the relevant time period, Defendant aided, agreed with, conspired with, and employed the Tracking Entities to accomplish the wrongful conduct at issue here by installing the Tracking Tools directly on the Website, causing them to intercept Plaintiff's communications.

248. Plaintiff Corona-Cantu and the California Subclass Members did not authorize or consent to the tracking, interception, and collection of any of their electronic communications.

## COUNT V
## VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT
## Cal. Penal Code § 638.51
## (On Behalf of Plaintiff Corona-Cantu and the California Subclass)

249. Plaintiff Corona-Cantu incorporates the above allegations as if fully set forth herein.

250. Plaintiff Corona-Cantu brings this cause of action on behalf of herself and all California Subclass Members.

251. A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

252. A "trap and trace device" is "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

253. "Process" includes "software that identifies consumers, gathers data, and correlates that data through unique 'fingerprinting.'"

254. California Penal Code § 638.51 provides that "a person may not install or use a pen register or a trap and trace device without first obtaining a court order…." Cal. Penal Code § 638.51(a).

255. No court order to install pen register or trap and trace devices via the Tracking Tools was obtained by Defendant. Defendant uses pen register and trap and trace processes on its Website by deploying Tracking Tools designed to capture phone numbers, email addresses, routing information, addresses, and other signaling information of website users. The Tracking Tools identify the source of the incoming electronic and wire communications to the Website.

256. Defendant was not authorized by any court order to use pen register or trap and trace devices to track Plaintiff Corona-Cantu's and the California Subclass Members' activity on the Website.

257. Defendant did not obtain consent from Plaintiff Corona-Cantu and the California Subclass Members before using pen register or trap and trace technology to identify users of its Website, and has violated § 638.51.

258. As a direct and proximate result of Defendant's conduct, Plaintiff Corona-Cantu and the California Subclass Members suffered losses and were damaged in an amount to be determined at trial. CIPA imposes civil liability and statutory penalties for violations of § 638.51.

## COUNT VI

## COMMON LAW FRAUD, DECEIT, AND/OR MISREPRESENTATION
## (On Behalf of Plaintiffs and the Nationwide Class)

259. Plaintiffs incorporate the above allegations as if fully set forth herein.

260. Plaintiffs bring this cause of action on behalf of themselves and all members of the Nationwide Class.

261. Defendant made affirmative representations to users through its Cookie Banner Two, California and Colorado Cookie Settings, and related disclosures that users could decline all non-essential cookies.

262. Defendant represented that exercising those options would limit or prevent the deployment of unnecessary cookies, and would stop the transmission of users' browsing activity, interactions, and related data to the Tracking Entities.

263. Defendant made these representations at the time users first accessed the Website and again when users were prompted to review and confirm their cookie preferences.

264. These representations were false and misleading. Before users, including Plaintiffs and the putative class members, were able to exercise the cookie and privacy choices provided by Defendant, or otherwise reject the Website's use of optional or unnecessary cookies, Defendant deployed the Tracking Tools to intercept and collect Plaintiffs' and the Nationwide Class Members' Sensitive Information and transmit the same to the Tracking Entities,

despite Defendant's representations that it would not track users until they consented to the Tracking Tools.

265. Defendant knew the representations were false or misleading, or acted with reckless disregard for their truth, because Defendant controlled the Website's source code, selected and configured the Tracking Tools, and determined how those tools operated in relation to users' expressed privacy choices.

266. Defendant had the technical ability to prevent post-opt-out data transmissions and to configure the Website so that non-essential tracking ceased when users declined such tracking. Industry-standard tools, configurations, and consent-management frameworks exist that permit websites to block, defer, or condition the loading of non-essential tracking technologies based on user preferences, and Defendant could have implemented such measures.

267. Defendant made misrepresentations with the intent to induce reliance by users, including Plaintiffs, by reassuring them that they could meaningfully control tracking while Defendant continued to collect and transmit data for its own commercial benefit.

268. Plaintiffs and the Nationwide Class Members reasonably and justifiably relied on Defendant's misrepresentations by continuing to use the Website and by exercising the opt-out controls instead of avoiding the Website, withholding information, or taking additional steps to protect their privacy.

269. Plaintiffs' reliance was reasonable because Defendant presented the Cookie Banner Two and California and Colorado Cookie Settings as mechanisms for exercising legally protected privacy rights and for controlling the collection and sharing of personal information.

270. As a direct and proximate result of Defendant's fraudulent conduct, Plaintiffs and the Nationwide Class Members suffered damages, including loss of privacy, loss of control over their personal information, and diminution in the value of their personal data.

271. Defendant's conduct also resulted in Defendant obtaining an unjust and improper benefit by continuing to collect, use, and monetize users' data despite representing that such practices would cease upon opt-out.

272. Plaintiffs and the Nationwide Class Members seek all available relief for Defendant's fraudulent conduct, including compensatory damages, restitution, disgorgement, punitive damages where available, and injunctive relief to prevent further misrepresentations.

## COUNT VII

## UNJUST ENRICHMENT

## (On Behalf of Plaintiffs and the Nationwide Class)

273. Plaintiffs incorporate the above allegations as if fully set forth herein.

274. Plaintiffs bring this cause of action on behalf of themselves and all Nationwide Class Members.

275. Defendant obtained a benefit by collecting, processing, and enabling third-party monetization of Plaintiffs' and the Nationwide Class Members' Sensitive Information, which Defendant then used to increase the effectiveness of advertising, marketing, and sales and to generate revenue.

276. It is unjust that Defendant retains those benefits under circumstances in which the information was collected and transmitted in breach of the representations made to users and without valid consent.

277. Plaintiffs and the Nationwide Class Members conferred these benefits on Defendant, and Defendant has been unjustly enriched at the expense of Plaintiffs and the Nationwide Class Members. Equity and good conscience require restitution or disgorgement of the benefits unjustly retained by Defendant. Therefore, Plaintiffs and the Nationwide Class Members are entitled to the relief set forth below.

## COUNT VIII
## DECLARATORY JUDGMENT
## (On Behalf of Plaintiffs and the Nationwide Class)

278. Plaintiffs incorporate the above allegations as if fully set forth herein.

279. Plaintiffs bring this cause of action on behalf of themselves and all Nationwide Class Members.

280. Under the Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of

the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

281. An actual controversy has arisen about Defendant's use of Tracking Tools, Defendant's disregard for the rights of Plaintiffs and the Nationwide Class, and Defendant's present and prospective common law and statutory duties to keep Plaintiffs' Sensitive Information confidential unless and until disclosure is authorized. As long as Defendant's unlawful actions persist, Plaintiffs remain at continued and imminent risk that their Sensitive Information will continue to be disclosed without their authorization.

282. Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring the following:

a. Defendant owes a legal duty to Plaintiffs and the members of the Nationwide Class to refrain from disclosing, or from facilitating the disclosure of, consumers' Sensitive Information without authorization.

b. Defendant's many breaches of these legal duties caused, and continue to cause, injury to Plaintiffs and the members of the Nationwide Class.

283. The Court should issue corresponding injunctive relief requiring Defendant to keep the Sensitive Information of Plaintiffs and the members of the Nationwide Class confidential as consistent with applicable law.

284. Without an injunction, the members of the Nationwide Class will suffer irreparable injury and lack an adequate legal remedy at law if Defendant continues to unlawfully disclose consumers' information without authorization.

285. If an injunction is not issued, the resulting hardship to Plaintiffs and the members of the Nationwide Class far exceeds the minimal hardship that Defendant could experience from keeping Plaintiffs' Sensitive Information confidential, and Defendant has a pre-existing legal obligation to do so. An injunction would benefit the public by preventing Defendant's further unlawful disclosures of consumers' Sensitive Information—thus preventing further injuries to Plaintiffs, the members of the Nationwide Class, and the public at large.

286. Monetary damages are fundamentally inadequate to address the ongoing harms inflicted by Defendant's unauthorized data-tracking practices because a retrospective award of monetary damages cannot stop the continuous, real-time exfiltration and commercial circulation of Plaintiffs' and the Nationwide Class Members' Sensitive Information. Even if monetary compensation were awarded for past privacy intrusions, Defendant and the Tracking Entities would remain capable of continuing their unlawful tracking, data harvesting, and profiling

activities unabated. Because Plaintiffs' Sensitive Information remains actively embedded in commercial circulation and subject to ongoing exploitation without valid consent, legal remedies at law fail to provide complete, prospective protection, necessitating a judicial declaration of rights and corresponding equitable relief to halt future unauthorized disclosures.

## PRAYER

WHEREFORE, Plaintiffs individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

a. An order certifying the class and making all appropriate class management orders;

b. For an order determining that this action is properly brought as a class action and certifying Plaintiffs as the representatives of the respective Class and Subclass and their counsel as Class Counsel;

c. For an order declaring that the Defendant's conduct violates the statutes referenced herein;

d. For an order finding in favor of Plaintiffs, the Class, and Subclass on all counts asserted herein;

e. Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to, requiring

Defendant to immediately (i) remove the Tracking Tools from the Website or (ii) add, and obtain, the appropriate consent from Website users and (iii) work with the Tracking Entities to delete all intercepted communications;

f. An award of statutory damages or penalties to the extent available;

g. For damages in amounts to be determined by the Court and/or jury;

h. For pre-judgment interest on all amounts awarded;

i. For an order of restitution and all other forms of monetary relief;

j. An award of all reasonable attorneys' fees and costs; and

k. Such other and further relief as the Court deems necessary and appropriate.

Dated: August 11, 2026

**HERMAN JONES LLP**

*/s/ John C. Herman*
John C. Herman (Ga. Bar No. 348370)
Candace N. Smith (Ga. Bar No. 654910)
3424 Peachtree Road, N.E., Suite 1650
Atlanta, Georgia 30326
Telephone: (404) 504-6500
Facsimile: (404) 504-6501
jherman@hermanjones.com
csmith@hermanjones.com

Mark S. Reich*
Mark Jensen*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com
Email: mjensen@zlk.com

*Attorneys for Plaintiffs and the Proposed Class*

**pro hac vice* forthcoming